# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

CHARLES WYCUFF,

      Petitioner,

      v.

JAMES HAVILAND, WARDEN,

      Respondent.

               **CASE NO. 2:19-CV-3549**
               **JUDGE EDMUND A. SARGUS, JR.**
               **Magistrate Judge Chelsey M. Vascura**

## ORDER and
## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the Court on the Petition, Respondent's Return of Writ, and the exhibits the parties submitted.  For the reasons that follow, it is **RECOMMENDED** that this action be **DISMISSED**.

In addition, Petitioner's Motion for Stay and Abeyance (ECF No. 7) is **DENIED**.

## I.      BACKGROUND

Petitioner challenges his April 17, 2018 convictions after a jury trial in the Franklin County Court of Common Pleas on charges of rape, gross sexual imposition, sexual battery, and pandering sexually oriented material involving a minor, with sexually violent predator specifications.  The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> On November 7, 2014, appellant was indicted on a 54-count indictment in Auglaize County, Ohio.  The indictment included charges for rape, in violation of R.C. 2907.02(A)(1)(b) and/or (A)(2), gross sexual imposition, in violation of R.C. 2907.05(A)(1) and/or (A)(4), sexual battery, in violation of R.C. 2907.03(A)(1) and/or (A)(5), and one count of pandering sexually oriented matter involving a

minor, in violation of R.C. 2907.322(A)(1) and/or (A)(3). Several of the counts included sexually violent predator specifications pursuant to R.C. 2941.148.

Although the events giving rise to the indictment occurred in Auglaize County, the Auglaize County Court of Common Pleas concluded that a fair and impartial trial could not be held in that court. As such, the court ordered that venue be transferred to Franklin County. A jury trial on the charges commenced October 6, 2015.

The sole victim of the charges was appellant's stepson, N.F. Appellant married N.F.'s mother, L.A., when N.F. was three or four years old. At that time, appellant and L.A. filed for and received custody of N.F. from his biological father. Appellant and L.A. had a child, C.A.W. who was four and one-half years younger than N.F. The family lived in the country near Wapakoneta, Ohio.

L.A. worked days as a school teacher, and appellant worked second or third shifts at a factory. As such, appellant would care for N.F. during the day when N.F. was a child. N.F. testified that, even during his early childhood, appellant "always acted like he didn't want [N.F.] there." (Tr. Vol. II at 21.) N.F. recalled being four years old and asking for some shampoo while taking a shower, and appellant walking in and "smack[ing] [N.F.] over the head." (Tr. Vol. II at 16.) When N.F. started kindergarten, he would become "physically sick to [his] stomach knowing [he] was going home" to appellant. (Tr. Vol. II at 23.) N.F. would frequently vomit or urinate himself when he was around appellant. When N.F. vomited or urinated himself, appellant would become upset and spank N.F.

When N.F. was young, appellant would use just his hand for spankings. As N.F. got older, appellant began to use belts or paddles made out of wood to spank N.F. Appellant would have N.F. watch as he crafted the paddle he was about to use for a spanking. N.F. described how "terrifying" it was knowing "what's coming before it even happens," and how appellant would "drill[] holes in [the paddle] so it was more * * * aerodynamic." (Tr. Vol. II at 37.) During these spankings, appellant "usually would tell [N.F.] to pull down [his] pants and grab [his] ankles, so [N.F.] would be standing up and holding [his] ankles." (Tr. Vol. II at 26.) N.F. would have to "sit in the bathtub with cold water" after a paddling "to try to keep the swelling and the bruising down." (Tr. Vol. II at 38.) Appellant would paddle N.F. for any reason or no reason; N.F. often did not know "why [he] was receiving this treatment." (Tr. Vol. II at 27.)

N.F. explained how appellant continuously made him "feel worthless." (Tr. Vol. II at 28.) Appellant would tell N.F. that he was "stupid, retarded, dumb, like [his] life didn't matter. Like when he told [N.F. he] never should have been born. Or [he] should have been a come stain on the sheets." (Tr. Vol. II at 28.) C.A.W. noted that "the verbal abuse" was "almost constant for [N.F.]." (Tr. Vol. III at 20.)

One of N.F.'s chores during his middle school years was to "clean up the dog poop area" outside. (Tr. Vol. II at 45.) N.F. once missed picking up a piece, and

appellant grabbed N.F. "by the back of [his] neck and he shoved [his] face in the pile of dog poop, and he took his other hand and shoved some in [N.F.'s] mouth, [and] told [him] to eat it." (Tr. Vol. II at 46.) N.F. confirmed that he ate the dog feces. L.A. witnessed this event, and confirmed that appellant "took [N.F.'s] face and shoved it down on the ground in the dog feces and made him eat it." (Tr. Vol. III at 143.)

Children services became involved twice during N.F.'s childhood; once due to the extent of bruising N.F. had from a paddling, and once after L.A. came home to find that N.F. had "swelling on his lip and a bruise." (Tr. Vol. III at 79.) Caseworkers from the Auglaize County Children Services department testified at trial regarding the agency's involvement with N.F. during the early nineties. The agency ultimately concluded that, although "there was abuse," the abuse was "not to the point to maintain active involvement with the family." (Tr. Vol. III at 70.) The agency "encouraged the mother to consider alternative babysitting arrangements for her son instead of having [appellant] in charge of him." (Tr. Vol. III at 87.)

As N.F. got older, the physical abuse became more intense. N.F. recalled appellant pressing pressure points on his body to inflict pain, slamming N.F. against doors, and repeatedly "punching [N.F.] in the chest so [he] would bounce off the door." (Tr. Vol. II at 43.) Appellant once threw N.F. against a door so hard that N.F.'s head hit the door, and N.F. "ended up going to the hospital for stitches in the back of [his] head." (Tr. Vol. II at 43.) N.F. recalled times where appellant would grab him by his "throat and he would hold [him] up against the door, off [his] feet." (Tr. Vol. II at 43.)

Appellant opened a metal fabrication shop on the family's property around 2000, and N.F. would help appellant in the shop. N.F. explained that, if he did not put the tools away correctly, appellant would "hit [N.F.] over the head, like with his hands, or smack [him] in the face. He would punch [N.F.] in the throat." (Tr. Vol. II at 54-55.) N.F. recalled appellant kicking him "in the groin when [they] were in the shop," hard enough that it left a bruise in that area that lasted "a week or two." (Tr. Vol. II at 55.) N.F. described appellant once hitting him in the shin with a "wrench or tool" and "it left, like, a cartilage or a bone chip or whatever on [his] shin." (Tr. Vol. II at 57.) Appellant once threw "a circular saw blade at [N.F.'s head. Like it went right by [his] head and it stuck in the wall." (Tr. Vol. II at 61.) C.A.W. noted that appellant told him he threw "saw blades at [N.F.]," and C.A.W. recalled seeing the "circular saw blades" that were "stuck in the drywall and they were still there." (Tr. Vol. III at 22.)

When N.F. was around 12 years old, appellant started to sexually abuse him. The first incident occurred on a day when N.F. "stayed home sick from school." (Tr. Vol. II at 80.) Appellant and N.F. were in the living room, and appellant told N.F. to take his clothes off. Appellant "started playing with [N.F.'s] genital area before he started performing oral on [him]." (Tr. Vol. II at 77.) N.F. did not orgasm, and appellant told N.F. that maybe he had not "hit maturity yet, or [he] wasn't old

enough to * * * ejaculate." (Tr. Vol. II at 79.) Appellant then "pulled down his pants and he sat on the couch. And then he told [N.F.] to start playing with his penis before he told [N.F.] to perform oral on him." (Tr. Vol. II at 79.) Appellant ejaculated in N.F.'s mouth, and N.F. stated that he was "Too afraid to spit it out so [he] swallowed it." (Tr. Vol. II at 79.) N.F. testified to several other instances of fellatio, noting that the "normal routine" was that appellant "performed oral sex on [N.F.] and then [N.F.] would perform oral sex on him." (Tr. Vol. II at 84.)

As time went on, the sexual abuse went further. N.F. explained that, when he was in high school, appellant came into his bedroom and "started with, you know, the usual, him playing with me, performing oral sex on me. He had me perform oral sex on him. But at the same time, same incident, he had told me to bend over the bed while I was standing and he was going to perform anal sex on me." (Tr. Vol. II at 86.) Appellant "put his penis inside of [N.F.'s] ass." (Tr. Vol. II at 86.) Appellant asked N.F. "if he could come inside of [him]," and N.F. was "too afraid to say no, so [he] said yes." (Tr. Vol. II at 87.) N.F. testified that appellant performed anal intercourse on him several times, and that appellant also had N.F. "perform anal intercourse on him." (Tr. Vol. II at 91.)

When N.F. was "in either tenth or eleventh grade," L.A. became involved in the sexual abuse. (Tr. Vol. II at 100.) N.F. explained that "[t]he first time it happened" appellant and L.A. had gone out for the night. (Tr. Vol. II at 100.) when they returned, appellant woke N.F. up and explained that L.A. was "in the [bed]room and there was going to be sexual activity of some sort." (Tr. Vol. II at 100.) Appellant took N.F. to appellant's and L.A.'s "bedroom. And [L.A.] was lying on the bed, on her back. And [appellant] told [N.F.] top perform oral sex on her." (Tr. Vol. II at 100.) N.F. did as he was told, and stated that L.A. was "moaning a little and, like, moving her legs a little bit like it was pleasurable" as he performed oral sex on her. (Tr. Vol. II at 102.) Appellant then told N.F. "to perform intercourse on her," but N.F. "could not get erect, and so it did not happen," and N.F. was "sent back to bed." (Tr. Vol. II at 102.)

N.F. explained that "[a] couple of months" after the first incident, "basically the exact same thing" happened again. (Tr. Vol. II at 103.) On this incident, however, N.F. was "more rect than the previous time" and did have intercourse with L.A. (Tr. Vol. II 104.) N.F. stated that he engaged in sexual activity with appellant and L.A. "at least two more times" after this second incident' N.F. recalled "ejaculating in [L.A.] three times total." (Tr. Vol. II at 104, 106.)

C.A.W. testified that he recalled being home with his mother, father, and half-brother, and being "told to go upstairs and turn on the music." (Tr. Vol. III at 29.) As C.A.W. went up to his room, he saw appellant, L.A., and N.F. go into appellant's and L.A.'s bedroom. While in his room, C.A.W. "heard [his] mother moaning, making sexual sounds," so he turned "the music off to see if it was actually what [he] was hearing, to confirm it, and it was." (Tr. Vol. III at 29.) C.A.W. recalled a

different time when they were all home, and appellant "told [C.A.W.] to go outside and play. And then the three of them walked in the bedroom." (Tr. Vol. III at 30.)

L.A. testified regarding the sexual conduct that occurred with N.F. and appellant. L.A. stated the first time it happened, she went out to a bar with appellant and came home "drunk." (Tr. Vol. III at 154.) Appellant undressed L.A. in their bedroom, then left and returned with N.F. L.A. stated that appellant told N.F. to touch her breasts, and then told L.A. to give N.F. "oral sex. [Appellant] then had [N.F.] go down on [L.A.]. [She] witnessed the two of them giving each other oral sex. [Appellant] then showed [N.F.] how to get on top of [L.A.] and told [N.F.] to have sex with [her]." (Tr. Vol. III at 154-55.) L.A. stated appellant was "directing" everyone on what to do. (Tr. Vol. III at 155.)

Although L.A. testified to this first incident, L.A. stated that over the "years, [she had] just repressed so much in [her] mind, that [she could not] recall what happened on the other occasions." (Tr. Vol. III at 160.) Appellant and L.A. divorced shortly after N.F. graduated from high school and left the home in 2003. A couple of years after the divorce, L.A. told her counselor about what she "did with [her] son." And informed her counselor that the sexual activity with N.F. and appellant occurred "four times." (Tr. Vol. III at 160.)

L.A. informed the jury that she had been charged with criminal charges resulting from these incidents. Pursuant to a plea bargain, L.A. pled guilty "to three charges of sexual battery, and one charge of obstructing official business," and agreed to testify truthfully in this case. (Tr. Vol. III at 130.)

Appellant took the stand and confirmed that "[a] lot" of the testimony regarding him "disciplining" N.F. was accurate. (Tr. Vol. IV at 48-49.) Appellant admitted that the "spanking and stuff," and also when he "put [N.F.'s] head against the door, that was physical abuse." (Tr. Vol. IV at 86.) Appellant explained, however, that he was forced to be "the disciplinarian" parent, since L.A. "would not touch him." (Tr. Vol. IV at 54.) Appellant stated he would discipline N.F. by "shov[ing] him down," or "crack[ing] him right upside the temple just to shut him up," but that he never "beat [N.F.] with a fist," never "open-faced him, and [he] never beat him on the body." (Tr. Vol. IV at 57.)

Appellant testified that N.F. "lied," and that "[t]here was no sexual activities" that ever occurred between him and N.F. (Tr. Vol. IV at 55, 92.)

N.F. joined the army after he graduated high school and, while in the army, N.F. would call appellant "every once in a while * * * and wanted money." (Tr. Vol. IV at 61.) Appellant testified that "altogether, in between the different times," he sent N.F. "three to four grand." (Tr. Vol. IV at 61.) After N.F. was discharged from the army, he briefly returned to the house in Wapakoneta for a couple of months, and then moved to New Jersey for work. Appellant stopped giving N.F. money when N.F. was in New Jersey. Appellant stated that "the day [he] quit giving [N.F.]

money [they] got in a big argument." (Tr. Vol. IV at 66.) N.F. disclosed the abuse to police after he had moved to New Jersey.

The jury returned a verdict of not guilty on the pandering charge, and returned verdicts of guilty on the remaining charges. Following a separate hearing, the jury also found appellant guilty of the sexually violent predator specifications. The court imposed an aggregate sentence of 4 consecutive life sentences, plus 105 years in prison to be served consecutively to the life sentences.

Appellant appeals, assigning the following four errors for our review:

[I.] [Appellant's] rights to due process and a fair trial were violated when the trial court allowed the State to present cumulative, overly prejudicial evidence about prior bad acts.

[II.] [Appellant's] rights to due process and a fair trial were violated when the trial court allowed the State to cross-examine [appellant] regarding prior bad acts the trial court had previously barred the State from presenting to the jury as they constituted cumulative and overly prejudicial.

[III.] [Appellant] was deprived of his constitutional right to the effective assistance of counsel.

[IV.] The trial court erred in submitting verdict forms for Counts 24, 25, 44, 45, 46, and 47 to the jury as the description on the verdict forms permitted jurors to convict [appellant] on multiple counts for the same conduct. The trial court compounded this error when it sentenced [appellant] on multiple counts for the same conduct and ran those sentences consecutively. Both errors violate double jeopardy protections.

(*Decision*, ECF No. 5, PAGEID # 223-29.) On April 17, 2018, the appellate court affirmed the judgment of the trial court. (*Id*.) On August 15, 2018, the Ohio Supreme Court declined to accept jurisdiction of the appeal. (*Entry*, ECF No. 5, PAGEID # 284.)

On July 13, 2018, Petitioner filed an application to reopen the appeal pursuant to Ohio Appellate Rule 26(B). He asserted that he had been denied the effective assistance of appellate counsel because his attorney failed to raise on appeal a claim of ineffective assistance of trial counsel "due to mental illness." (ECF No. 5-1, PAGEID # 362.) On March 12, 2019, the appellate court denied the Rule 26(B) application. (*Memorandum Decision*, ECF No. 5-1,

PAGEID # 361.)  On June 12, 2019, the Ohio Supreme Court declined to accept jurisdiction of the appeal.  (*Entry*, ECF No. 5-1, PAGEID # 384.)

On June 27, 2017, Petitioner filed a Petition to Vacate or Set Aside Judgment of Conviction or Sentence, asserting that he had been denied the effective assistance of trial counsel.  (ECF No. 5-1, PAGEID # 386.)  The record does not reflect that the trial court has issued a ruling on that action.  Petitioner also represents that he recently filed a motion for a new trial and a post-conviction petition in the state trial court.  (*See Motion for Stay and Abeyance*, ECF No. 7.)  Review of the state-court's docket reflects that he filed such an action on December 18, 2019, asserting the denial of the effective assistance of trial counsel based on his attorney's alleged health issues.  Petitioner states that he learned in April 2019 that one of his former attorneys died after suffering from Alzheimer's and dementia, and he bases is claim of denial of effective assistance of counsel on this information.  The trial court has not yet ruled on Petitioner's motion for a new trial.  Petitioner seeks a stay of the proceedings in this Court pending resolution of his state-court action.

On August 15, 2019, Petitioner, proceeding without counsel, filed this habeas corpus petition pursuant to 28 U.S.C. § 2254.  He asserts that he was denied a fair trial due to the admission of unindicted and unduly prejudicial evidence of prior bad acts (claim one); that he was denied a fair trial because the trial court permitted Petitioner's cross-examination on inadmissible and cumulative prior bad acts (claim two); that he was denied the effective assistance of trial counsel because his attorney failed to object to prior bad acts evidence, failed to request limiting instructions, and failed to object to improper language used in verdict forms (claim three); and that his convictions on multiple counts violate the Double Jeopardy Clause due to improper verdict forms (claim four).  It is the Respondent's position that Petitioner has

7

procedurally defaulted these claims and that they do not provide a basis for relief. The undersigned agrees.

The undersigned considers Petitioner's Motion for Stay and Abeyance (ECF No. 7) as a threshold matter before turning to analyze each of his claims.

## II.    PETITIONER'S MOTION FOR STAY AND ABEYANCE

Petitioner seeks a stay of proceedings pending resolution of his motion for a new trial in which he asserts that he was denied the effective assistance of counsel based on health issues suffered by one of his former attorneys, John Poppe. Petitioner asserts that Poppe, now deceased, failed to disclose to Petitioner that he suffered from Alzheimer's and dementia during trial. Respondent has not filed a response to Petitioner's request for a stay.

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petitioner must first exhaust his claims in the state courts before presenting them in federal court. 28 U.S.C. § 2254(b); *see Rockwell v. Yukins*, 217 F.3d 421, 423 (6th Cir. 2000). If a habeas petitioner has the right under state law to raise a claim by any available procedure, the claim is not exhausted. 28 U.S.C. § 2254(b), (c). Additionally, a constitutional claim for relief must be presented to the state's highest court in order to satisfy the exhaustion requirement. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999); *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990). A habeas petitioner bears the burden of demonstrating that exhaustion of the available state-court remedies with respect to the claims presented for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987).

A district court has the discretion to stay a "mixed petition," containing both exhausted and unexhausted claims, to permit a petitioner to present his unexhausted claim to the state courts, and then to return to federal court for review. *Rhines v. Weber*, 544 U.S. 269 (2005).

Nonetheless, stays under these circumstances should be granted sparingly. *Id*. at 277 (recognizing that "[s]taying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings" and that it "undermines AEDPA's goal of streamlining federal habeas proceedings by decreasing a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition"). Stated differently, the Court held that "stay and abeyance should be available only in limited circumstances," and is appropriate only if there is good cause for the Petitioner's failure to exhaust his claims first in state court. *Id*. at 277. Finally, even if good cause exists, a stay is inappropriate where the unexhausted grounds are plainly meritless. *Id*. Thus, an abuse of discretion in denying a stay and dismissing the petition may be found only "if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Id*.

Here, none of the claims presently before the Court remain unexhausted. "The fact [the petitioner] has a separate claim pending in state court does not render his current petition a 'mixed' petition." *Jackson v. Sloan*, 2018 WL 7269782, at *7 (N.D. Ohio Sept. 25, 2018) (citing *Bowling v. Haeberline*, No. 03-5681, 2007 WL 2321302, at *2 (6th Cir. Aug. 14, 2007); *Gatlin v. Clipper*, No. 5:13-cv-2434, 2014 WL 2743208 at * 5 (N.D. Ohio June 17, 2014)). "Some courts, including lower courts within the Sixth Circuit, have declined to extend the *Rhines* stay-and-abeyance procedure to petitions, such as this, containing only unexhausted claims." *Callender v. Warden, Ross Corr. Inst.,* No. 2:16-cv-1120, 2017 WL 3674909, at *3 (S.D. Ohio Aug. 24, 2017) (quoting *Peterson v. Warden, Pickaway Corr. Inst*., No. 1:14-cv-604, 2015 WL 3970171, at *7 (S.D. Ohio June 30, 2015) (internal citations omitted)); *see also Worley v. Bracy*, No. 1:18-cv-00050, 2018 WL 4443137 (N.D. Ohio July 11, 2018) (denying stay where the

petition presents no unexhausted claims); *Jackson v. Sloan*, 2018 WL 7269782, at *7-8 (N.D. Ohio Sept. 25, 2018) (finding that the *Rhines* "stay and abeyance procedure . . . is applicable only when a petitioner presents a "mixed petition"") (citation omitted).

Further, although Petitioner has not yet advanced a claim in this action asserting ineffective assistance of *trial* counsel, review of the record reveals that any such claim would lack merit. In Rule 26(B) proceedings, the state appellate court rejected Petitioner's contention that his counsel's health issues rendered his performance ineffective, explaining as follows:

> Appellant asserts his trial counsel, John Poppe, was suffering from Alzheimer's disease at trial and that the disease "played a big part in trial counsel's inability to try this case." (Application to Reopen at 4.) Appellant contends Poppe "appeared confused and disoriented" during trial and "lacked participation and repeatedly forgot names of witnesses including his own client." (Application to Reopen at 1.) Appellant was represented by three attorneys at trial: Eric Allen, Jessica Wirick, and Poppe. (*See* Tr. Vol. I at 2.) Allen cross-examined the state's witnesses and conducted the direct examination of appellant during the defense's case-in-chief. Poppe presented only the character witnesses during the defense's case-in-chief.

> Appellant attached a May 24, 2017 letter from his friend and character witnesses, D.S., III, to his application to support his contention that Pope had been diagnosed with Alzheimer's. D.S. states in the letter that, after appellant's trial, D.S. learned that Poppe was no longer practicing law and "learned that Mr. Poppe had been diagnosed with Alzheimer's disease." (D.S. Letter.)

> \*\*\*

> [T]he record does not support appellant's contention that Poppe repeatedly forgot witnesses' names at trial. For instance, during his examination of M.R., Poppe stated, "[M.R.], good morning to you sir. [M.R.], can you tell me where you live? 8 8 8 and do you know my client, [C.W.]" (Tr. Vol. V at 9-10.) Similarly, during his examination of D.S., Poppe asked "[D.S]" to explain "how [he] became familiar with [C.W.]." (Tr. Vol. IV at 167, 170.) Poppe asked witness M.W.********t if he knew "[C.]W*******t? Excuse me. [C.W.] Excuse me." (Tr. Vol. V at 31.) Although Poppe initially mixed up W*********t's last name and appellant's last name, Poppe immediately corrected himself.

> The record demonstrates that Poppe addressed each of the seven character witnesses by name, inquired regarding the witnesses' relationship to appellant, and asked the witnesses about appellant's reputation for truthfulness in the community.

(*See* Tr. Vol. IV at 166-80; Vol. V at 8-32.) The record fails to demonstrate deficient performance by Poppe. . . .

Appellant asserts, citing Tr. Vol. II at 65-69 and 189-90, that "[Poppe's] lack of participation during trial was addressed by the court several times." (Application to Reopen at 3.) On the cited pages, however, the court does not address Poppe directly. Rather, the court notes that the defense had not objected to the state's presentation of evidence regarding appellant's physical abuse of N.F. In appellant's direct appeal, his appellate counsel argued that trial counsel rendered ineffective assistance by failing to object to the physical abuse evidence. *Id* at ¶ 52. In rejecting this assignment of error, we held that trial counsel's decision not to object to the physical abuse evidence was a tactical decision which did not support an ineffective assistance of counsel claim. *Id*. at ¶ 55.

As the record fails to demonstrate either that Poppe was suffering from a mental illness or that Poppe performed deficiently at trial, appellate counsel did not render deficient performance by failing to raise a claim of ineffective assistance of trial counsel based on Poppe's alleged mental illness.

(*Memorandum Decision*, ECF No. 5-1, PAGEID # 365.) The forgoing discussion demonstrates that Petitioner lacks any potentially meritorious unexhausted claim of ineffective assistance of counsel.

For these reasons, Petitioner's Motion for Stay and Abeyance (ECF No. 7) is **DENIED**.

## III.    PROCEDURAL DEFAULT

**A.    Procedural Default Standards**

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If the prisoner fails to do so, but still has an avenue open to present the claims, then the petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless*, 459 U.S. 4,

6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971).  Where a petitioner has failed to exhaust claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas." *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The term "procedural default" has come to describe the situation where a person convicted of a crime in a state court fails (for whatever reason) to present a particular claim to the highest court of the State so that the State has a fair chance to correct any errors made in the course of the trial or the appeal before a federal court intervenes in the state criminal process. This "requires the petitioner to present 'the same claim under the same theory' to the state courts before raising it on federal habeas review." *Hicks v. Straub*, 377 F.3d 538, 552–53 (6th Cir. 2004) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)).  One of the aspects of "fairly presenting" a claim to the state courts is that a habeas petitioner must do so in a way that gives the state courts a fair opportunity to rule on the federal law claims being asserted.  That means that if the claims are not presented to the state courts in the way in which state law requires, and the state courts therefore do not decide the claims on their merits, neither may a federal court do so. As the Supreme Court found in *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977), "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case—that is, they are "procedurally defaulted."

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test.  *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*).  First, the court must determine that there is a state procedural rule that is

applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he or she was actually prejudiced by the alleged constitutional error. *Id*.

Turning to the fourth part of the *Maupin* analysis, in order to establish cause, petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Constitutionally ineffective counsel may constitute cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In order to constitute cause, an ineffective assistance of counsel claim generally must "'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" *Edwards*, 529 U.S. at 452 (quoting *Murray v. Carrier*, 477 U.S. 478, 479 (1986)). That is because, before counsel's ineffectiveness will constitute cause, "that ineffectiveness must itself amount to a violation of the Sixth Amendment, and therefore must be both exhausted and not procedurally defaulted." *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir. 2005). Or, if procedurally defaulted, petitioner must be able to "satisfy the 'cause and prejudice' standard with respect to the ineffective-assistance claim itself." *Edwards v. Carpenter*, 529 U.S. 446, 450–51 (2000). The Supreme Court explained the importance of this requirement:

We recognized the inseparability of the exhaustion rule and the procedural-default doctrine in *Coleman*: "In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court. The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases." 501 U.S., at 732, 111 S.Ct. 2546, 115 L.Ed.2d 640. We again considered the interplay between exhaustion and procedural default last Term in *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999), concluding that the latter doctrine was necessary to " 'protect the integrity' of the federal exhaustion rule." Id., at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (quoting id., at 853, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting)). The purposes of the exhaustion requirement, we said, would be utterly defeated if the prisoner were able to obtain federal habeas review simply by "'letting the time run'" so that state remedies were no longer available. *Id*., at 848, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1. Those purposes would be no less frustrated were we to allow federal review to a prisoner who had presented his claim to the state court, but in such a manner that the state court could not, consistent with its own procedural rules, have entertained it. In such circumstances, though the prisoner would have "concededly exhausted his state remedies," it could hardly be said that, as comity and federalism require, the State had been given a "fair 'opportunity to pass upon [his claims].'" *Id*., at 854, 526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (STEVENS, J., dissenting) (emphasis added) (quoting *Darr v. Burford*, 339 U.S. 200, 204, 70 S.Ct. 587, 94 L.Ed. 761 (1950)).

*Edwards*, 529 U.S. at 452–53.

If, after considering all four factors of the *Maupin* test, the court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)).

## B. Application

In claim one, Petitioner asserts that he was denied a fair trial due to the admission of uncharged prior bad acts evidence regarding his physical abuse of the alleged victim without appropriate limiting instructions. In claim two, Petitioner asserts that he was denied a fair trial

because the trial court permitted Petitioner's cross-examination on cumulative and inadmissible

prior bad acts.

The state appellate court reviewed Petitioner's claim of improper admission of prior

physical abuse evidence for plain error only, due to Petitioner's failure to object:

> Appellant notes his trial counsel did not object to the physical abuse evidence and, thus, waived all but plain error.
>
>               ***
>
> [E]vidence of a defendant's prior acts of violence may demonstrate why a victim's will was overcome by their fear of the defendant, and thereby establish the force element of a rape charge. *See State v. Williamson*, 8th Dist. No. 80982, 2002-Ohio-6503, ¶ 23 (noting the "evidence of the physical violence that occurred in the household [was] relevant to and probative of the method of control used by defendant to rape and sexually abuse the victim"); *State v. Jordan*, 2d Dist. No. 26163, 2016-Ohio-603, ¶ 21 (holding that the "other-acts evidence" of the defendant's violent acts was "relevant to the element of force"); *State v. Scott*, 5th Dist. No. 11CA80, 2012-Ohio-3482, ¶ 28-29 (noting the evidence indicating that the defendant killed the victim's baby sister "was offered to show the victim's state of mind; * * * and why she was in fear of [defendant]," and thus was not "improper propensity evidence, but instead tend[ed] to show an element of the crime [of rape], force").
>
> N.F. explained he did not want to engage in the sexual acts with appellant, but stated he "never questioned what" appellant told him to do, because if he questioned appellant that "results to physical violence or physical abuse." (Tr. Vol. II 108.) Thus, the physical abuse evidence demonstrated N.F.'s will was overcome by his fear of appellant, and explained why N.F. did not resist appellant's demands for sexual activity.
>
> Additionally, during N.F.'s testimony, the court provided the jury with the following limiting instruction:
>
>> Let me just advise you that I have permitted testimony on the direct examination of this witness dealing with alleged prior bad acts on behalf of the [appellant] in this case. I did not admit that evidence to show that [appellant], if he did commit a bad act before, he acted in conformance with that action with respect to [N.F.] and the matters that you are to decide, the sexual-related offenses.
>>
>> But I have permitted that to be introduced for the purpose of showing [N.F.'s] state of mind and whether he was fearful of

[appellant]. So you can only consider it for that purpose and that purpose only.

(Tr. Vol. II at 69-70.)

We presume the jury followed the courts instruction. . . . Appellant argues the trial court's failure to reiterate the limiting instruction when other witnesses testified to the physical abuse, or to reiterate the instruction in the final jury instructions, amounts to plain error. Although "'the failure to give any limiting instruction constitutes plain error,'" here the trial court did provide the jury with a limiting instruction the first time the other-acts evidence was presented. *State v. Shaw*, 2d Dist. No. 21880, 2008-Ohio-1317, ¶ 13, quoting *State v. Tisdale*, 2d Dist. No. 19346, 2003-Ohio-4209, ¶ 47 (noting that "'[t]he limiting instruction should be given at the time the "other acts" evidence is received'"). Accordingly, we do not find plain error.

The evidence of physical abuse was relevant to a fact of consequence, as it established the force element of the rape charges. *Williams* at ¶ 20. The evidence was not presented to prove appellant acted in conformity therewith, and the court instructed the jury the evidence was not to be used for that purpose. *Id*. The probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, and any danger of unfair prejudice was reduced by the court's limiting instruction. *Id*. at ¶ 24.

(*Decision*, ECF No. 5, PAGEID # 229-32.)

Because the state appellate court reviewed Petitioner's claim challenging admission of

the physical abuse evidence for plain error only based on his failure to object, this claim is

waived. *See Norton v. Sloan*, No. 1:16-cv-854, 2017 WL 525561, at *12 (N.D. Ohio Feb. 9,

2017) (citing *Durr v. McLaren*, No. 15-1346, 2015 WL 5101751, at *2 (6th Cir. Aug. 28, 2015)).

The United States Court of Appeals for the Sixth Circuit has held that Ohio's contemporaneous-

objection rule constitutes an adequate and independent state ground to preclude federal habeas

review. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334-35 (6th Cir.) (citation omitted), *cert. denied*

*sub nom. Wogenstahl v. Robinson*, 568 U.S. 902 (2012); *Awkal v. Mitchell*, 613 F.3d 629, 648-49

(6th Cir. 2010), *cert. denied*, 562 U.S. 1183 (2011). The state appellate court's plain error

review does not constitute a waiver of the state's procedural default rules. *Keith v. Mitchell*, 455

F.3d 662, 673 (6th Cir. 2006), *cert. denied sub nom. Keith v. Houk*, 549 U.S. 1308 (2007).

Moreover, an appellate court's alternative ruling on the merits does not remove the procedural

default. *See Teitelbaum v. Turner*, No. 2:17-cv-583, 2018 WL 2046456, at *21 (S.D. Ohio May

2, 2018) (citing *Conley v. Warden, Chillicothe Corr. Inst.*, 505 F. App'x 501, 506 (6th Cir. 2012)

(citing *Harris v. Reed*, 489 U.S. 255, 264 n. 10 (1989); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir.

1998)).

As to Petitioner's claim challenging the improper admission of his prior acts of violence,

the appellate court found that Petitioner had "opened the door," or invited admission of this

evidence:

> Appellant's second assignment of error asserts the trial court erred when it allowed plaintiff-appellee, State of Ohio, to cross-examine appellant about specific acts of violence. Prior to trial, appellant filed a motion in limine asking the court to exclude evidence indicating appellant had molested his sister when they were children, and that he shot and killed a number of family pets. . . .
>
> During appellant's direct examination, appellant stated that, although he "had a temper with [N.F.] or anybody else," he was "not a violent person." (Tr. Vol. IV at 50.) Appellant reiterated on cross-examination that he was not a violent person. (See Tr. Vol. IV at 121.) The state asked the court if it could "talk about the acts of violence that [it was] aware of," since appellant had declared on the stand that he [was] not a violent person." (Tr. Vol. IV at 113.) The court told the state it could inquire about both topics.
>
> The state asked appellant if he considered shooting animals on his property violence. Appellant responded he "didn't consider it violence," and stated he had shot and killed "[a] couple pets," noting that one was "a rottweiler," and one was a "black lab." (Tr. Vol. IV at 122-23.) Appellant denied that he made N.F. kill his own pet dog. Appellant admitted that he "threw a pitchfork" at some goats, and that he shot "[a] little horse." (Tr. Vol. IV at 123.) Appellant denied ever sexually abusing his sister.
>
> Although "the prosecution may not initiate questioning to establish a criminal defendant's propensity for violence in a trial for violent offenses," a defendant "may introduce testimony, through himself or others, of a relevant character trait that would tend to prove he acted in conformity therewith on a particular occasion." *State v. Eldridge*, 12th Dist. No. CA2002-10-021, 2003-Ohio-7002, ¶ 41, citing Evid.R. 404(A). "In a trial involving a violent offense, that character trait is

typically for peacefulness." *Id.* When a defendant introduces evidence of a particular character trait, "the defendant 'opens the door' for the prosecution, which is then permitted to rebut or impeach this character evidence on cross examination." *Id.* at ¶ 42, citing Evid. R. 405(A). "The cross-examination may include inquiry into relevant specific instances of conduct." *Id.*, citing Evid.R. 405(A).

Appellant argues he did not open the door for the state to inquire about the specific instances of violence, as the state could have relied on the physical abuse evidence to impeach appellant's claim that he was not a violent person. We disagree.

Appellant testified there were "things that led up to the temper" he had toward N.F. (Tr. Vol. IV at 51.) Appellant explained that N.F. "lied a lot," and was "cunning. He was good at telling fibs and just get[ting] things going." (Tr. Vol. IV at 55.) Appellant described N.F. as not "a quiet little boy. He had a mouth on him, liked to use it," and stated that N.F. "always challenged" him. (Tr. Vol. IV at 56.) Appellant explained that when N.F. "would want to confront [appellant on] why not to do" something appellant had asked N.F. to do, appellant's "reaction was to discipline him." (Tr. Vol. IV at 57.)

Thus, appellant testified N.F.'s conduct essentially provoked him to use physically violent means of discipline. Accordingly, when appellant testified that, in general, he was not a violent person, he opened the door for the state to ask about specific instances of violence which were directed toward victims other than N.F. *See State v. Higgins,* 2d Dist. No. 18974, 2002-Ohio-4679, ¶ 39 (noting that "[w]hen Higgins testified that he [was] not a violent person, he put into issue his propensity for violence," and "[e]vidence concerning this trait of his character became admissible").

(*Decision*, ECF No. 5, PAGEID # 234-35.)

The state appellate court's application of invited error review bars federal habeas corpus

review of Petitioner's claim challenging the improper admission of his prior acts of violence.

*See Wagner v. Bradley*, No. 3:17-cv-1616, 2019 WL 2636269, at *4 (N.D. Ohio June 27, 2019)

(citing *Grant v. Brigano*, C-1-03-896, 2007 WL 2782742, at *7 (S.D. Ohio Sept. 24, 2007)

(applying invited error doctrine bars federal habeas review).

The doctrine of "invited error" is a branch of the doctrine of waiver in which courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside. *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 61 (6th Cir.1991). When a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error. *See Leverett*

> *v. Spears*, 877 F.2d 921, 924 (11th Cir.1989); *Draughn v. Jabe*, 803 F.Supp. 70, 75
> (E.D. Mich.1992).

*Fields v. Bagley*, 275 F.3d 478, 485-86 (6th Cir. 2001). *See also Teitelbaum*, 2018 WL 2046456,

at *21 (citing *Young v. Larose*, No. 4:13-cv-220, 2015 WL 5233417, at *13 (N.D. Ohio Sept. 8,

2015) (citing *Fulcher v. Motley*, 444 F.3d 791, 798–99 (6th Cir. 2006)) (other citations omitted)

(concluding that the petitioner waived claim under doctrine of invited error).

Regardless, Petitioner's assertion that admission of prior bad acts evidence denied him a

fair trial lacks viability as a basis for federal habeas corpus relief. *See Williams v. Warden,*

*Chillicothe Corr. Inst.*, No. 2:13-cv-1002, 2015 WL 3466120, at *11 (S.D. Ohio June 1, 2015)

(quoting *Norris v. Davis*, No. 05–60126, 2006 WL 1581410 (E.D.Mich. May 3, 2006) ("[T]he

Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair

trial by the admission of prior bad acts evidence which is relevant in the defendant's trial.");

*Bugh v. Mitchell*, 329 F.3d 469, 512–13 (6th Cir. 2003) ("There is no clearly established

Supreme Court precedent which holds that a state violates due process by permitting propensity

evidence in the form of other bad acts evidence.").

In claim four, Petitioner asserts that his convictions violate the Double Jeopardy Clause

due to improper verdict forms. The state appellate court reviewed this claim for plain error only,

due to Petitioner's failure to object:

> Appellant's fourth assignment of error asserts the trial court erred in submitting
> some of the verdict forms to the jury, as the captions on the verdict forms allowed
> the jury to convict appellant on multiple counts for the same conduct, in violation
> of double jeopardy.
>
> * * *
>
> Appellant did not object to the language on the verdict forms, or to the court's
> imposition of sentence. Accordingly, we review for plain error. "Notice of plain
> error * * * is to be taken with the utmost caution, under exceptional circumstances
> and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d

19

(1978), paragraph three of the syllabus. "For a court to notice plain error, the error must be an obvious defect in a trial's proceedings, it must have affected substantial rights, and it must have affected the outcome of the trial." *State v. Steele*, 138 Ohio St.3d 1, 2013-Ohio-2470, ¶ 30, citing *State v. Eafford*, 132 Ohio St.3d 159, 2012-Ohio-2224, ¶ 11. Even if an error satisfies these three requirements, "Crim.R. 52(B) states only that a reviewing court 'may' notice plain forfeited errors; a court is not obligated to correct them." *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

Appellant asserts that "[b]ased on the State's description of the incidents written on the verdict forms to differentiate the Counts, Counts 22 and 23 are the same charges for the same conduct from the same incident as Counts 24 and 25," and that "Counts 34, 35, 36, and 37 are the same charges for the same conduct from the same incident as Counts 44, 45, 46, and 47." (Appellant's Brief at 59.) Appellant further argues punishments for the same conduct." (Appellant's Brief at 59-60.)

Count 22 charged appellant with rape and Count 23 charged appellant with sexual battery. The caption on the verdict forms for both Counts 22 and 34 was "ANAL INTERCOURSE – DEFENDANT ON VICTIM – VICTIM'S BEDROOM INCIDENT, DEFENDANT EJACULATED ON VICTIM'S BACK." (Verdict Forms, R. at 196-97.) Counts 24 and 25 charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts was "ANAL INTERCOURSE – DEFENDANT ON VICTIM – VICTIM'S BEDROOM INCIDENT, VICTIM AND DEFENDANT FACING EACH OTHER." (Verdict Forms, R. at 198-99.)

N.F. explained that, during the first incident of anal intercourse in his bedroom, appellant ejaculated inside of him. N.F. described another incident of anal intercourse occurring in his bedroom where appellant "pulled out and he ejaculated on [N.F.'s] back." (Tr. Vol. II at 89.) This incident supports the charges in Counts 22 and 23. N.F. then described "another time," in his bedroom, on a "different time and day," where appellant had N.F. "lay on the bed with [his] legs up and [his] butt * * * facing toward the edge of the bed. And then [appellant] was standing, performing anal on [N.F.], and playing with [his] penis at the same time." (Tr. Vol. II at 88.) This incident supports the charges in Counts 24 and 25.

The trial court merged Count 22 with Count 23, and merged Count 24 with Count 25. (See Sentencing Entry at 2.) The court sentenced appellant to ten-year terms of imprisonment on both Count 22 and Count 24, to be served "consecutive with each other and consecutive with all other counts." (Jgmt. Entry at 2.) As separate conduct supports the charges, the trial court properly merged the lesser-included offenses into the greater offenses, and sentenced appellant only on the greater offenses. Appellant's contentions regarding these charges lack merit.

Counts 34 and 35 charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts stated "CUNNILINGUS – TIME WITH THE PILL INCIDENT." (Verdict Forms, R. at 206-07.) Counts 36 and 37

charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts stated "VAGINAL INTERCOURSE – TIME WITH THE PILL INCIDENT." (Verdict Forms, R. at 208-09.) Counts 44 and 45 charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts stated "CUNNILINGUS – 3RD INCIDENT." (Verdict Forms, R. at 212-13.) Counts 46 and 47 charged appellant with rape and sexual battery, respectively, and the caption on the verdict forms for these counts stated "VAGINAL INTERCOURSE – 3RD INCIDENT." (Verdict Forms, R. at 214-15.)

These charges concerned the conduct involving L.A., N.F., and appellant. N.F. testified that "[t]he first time it happened," N.F. performed oral sex on L.A., and appellant instructed N.F. to have intercourse with L.A., but N.F." could not get erect, and so it did not happen." (Tr. Vol. II at 100, 102.)

N.F. explained that "[a] couple months" after the first incident, appellant woke N.F. up in the night and told him that L.A. "was waiting for [them]." (Tr. Vol. II at 103.) N.F. explained that he "was instructed to perform oral on her again. * * * And then have intercourse with her, which somewhat happened. [N.F.] h ad a hard time staying erect again, but more – [he] was more erect than the previous time." (Tr. Vol. II at 104.)

N.F. stated that the "hard time is when [he] was able to stay erect. And [appellant] instructed that [he] try to come inside [L.S.], which [he] eventually did." (Tr. Vol. II at 104-05.) N.F. explained that, on "the third time," before they "went into the bedroom that time, [appellant] had taken [him] into the kitchen and given [him] a pill with some water." (Tr. Vol. II at 133.) However appellant "explained it," N.F. understood that the pill was to help him "to stay erect." (Tr. Vol. II at 133.) This incident supports the vaginal intercourse charges in Counts 36 and 37.

N.F. described L.A. performing fellatio on him during a time "when there was a lot of back and forth between [L.A.] performing oral on [N.F.] and [appellant], and [appellant] performing oral on—on [N.F.] and her, and [N.F.] performing oral on both of them." (Tr. Vol. II at 105.)

N.F. never testified to cunnilingus preceding the time with the pill incident. However, in the final incident where there was "a lot of back and forth," N.F. testified he performed "oral" on L.A. (Tr. Vol. II at 105.) Notably, Counts 48, 49, 50, 51, 52, and 53 all concern fellatio that occurred during the back and forth incident. (See Verdict Forms, R. at 216-21.) Thus, the cunnilingus from the back and forth incident supports the conduct charged in Counts 34 and 35.

The conduct charged in Counts 44, 45, and 47 should have stated 2nd incident rather than 3rd incident; and the caption on the verdict forms for Counts 34 and 35 should have identified the cunnilingus as occurring during the back and forth incident rather than the time with the pill incident. However, the verdict captions at issue do not present the manifest miscarriage of justice necessary to support a showing

of plain error. N.F. testified to conduct which supports each of the charges at issue. The trial court also properly instructed the jury as to the elements of each charge. (See Tr. Vol. V at 122-87); *Himes* at ¶ 36-37 (noting that the "verdict form need not state each of the essential elements" of the offense; rather, "this is the function of jury instructions") R.C. 2945.11.

Accordingly, because the record contains evidence which separately supports the conduct charged in each count, appellant fails to establish prejudice, and the misstatements in the verdict captions do not amount to plain error. . . .

The trial court merged Count 34 with Count 35, Count 36 with Count 37, Count 44 with Count 45, and Count 46 with Count 47. (See Sentencing Entry at 2.) The court sentenced appellant to respective ten-year terms of imprisonment each on Counts 34, 36, 44, and 46, to be served "concurrent with each other, and consecutive with all other counts." (Jgmt. Entry at 2.) Accordingly, as separate conduct supports the counts, the court merged the lesser-included offenses into the greater offenses and sentenced appellant only on the greater offenses. Appellant fails to demonstrate a double jeopardy violation.

(*Decision*, ECF No. 5, PAGEID # 240-43.) As discussed above, the state appellate court's review of this claim for plain error only based upon Petitioner's failure to object means this claim is waived in these proceedings. *See Norton*, 2017 WL 525561, at *12.

Moreover, Petitioner has procedurally defaulted claim four because he failed to raise this claim in the Ohio Supreme Court. (*See Memorandum in Support of Jurisdiction*, ECF No. 5-1, PAGEID # 372.) Consequently, he may no longer do so under Ohio's doctrine of *res judicata*. *See State v. Cole*, 2 Ohio St.3d 112 (1982); *State v. Ishmail*, 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175 (1967). The state courts were never given an opportunity to enforce the procedural rule at issue due to the nature of Petitioner's procedural default. The Sixth Circuit has held that Ohio's doctrine of *res judicata* is an independent and adequate ground for denying federal habeas relief. *See, e.g., Lundgren v. Mitche*ll, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). *Maupin's* independence prong is likewise satisfied under

because Ohio's doctrine of *res judicata* does not rely on or otherwise implicate federal law. For this additional reason, claim four must be dismissed. *See Sturm v. Darnell*, No. 2:10-cv-00247, 2012 WL 220211, at *15 (S.D. Ohio Jan. 25, 2012) (citations omitted) (enforcing procedural default under these circumstances).

Petitioner may, however, still obtain review of claim four on the merits, if he establishes cause for his procedural defaults, as well as actual prejudice from the alleged constitutional violations. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[,] '. . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule.'" *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). "[P]etitioner has the burden of showing cause and prejudice to overcome a procedural default." *Hinkle v. Randle*, 271 F.3d 239, 245 (6th Cir. 2001) (citing *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (internal citation omitted)). A petitioner's *pro se* status, ignorance of the law, or ignorance of procedural requirements are insufficient bases to excuse a procedural default. *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir.), *cert. denied*, 543 U.S. 989 (2004). Instead, in order to establish cause, a petitioner "must present a substantial reason that is external to himself and cannot be fairly attributed to him." *Hartman v. Bagley*, 492 F.3d 347, 358 (6th Cir. 2007), *cert. denied sub nom. Hartman v. Bobby*, 554 U.S. 924 (2008). Further, attorney error in proceedings wherein there is no right to counsel—such as in the filing of a motion for a discretionary appeal with the Ohio Supreme Court—cannot serve as cause for a procedural default. *See McClain v. Kelly*, 631 F. App'x 422, 429 (6th Cir. 2015) (citing *Coleman v. Thompson*, 501 U.S. 722, 752 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) (The right to counsel extends to the first appeal of right and no further). Thus, the alleged ineffective

assistance of counsel cannot constitute cause for Petitioner's failure to raise his claim that his convictions violate the Double Jeopardy Clause based on improper verdict forms in the Ohio Supreme Court. The undersigned therefore finds that Petitioner has failed to establish cause for his procedural default of claim four.

The United States Supreme Court has held that a claim of actual innocence may be raised "to avoid a procedural bar to the consideration of the merits of [the petitioner's] constitutional claims." *Schlup v. Delo*, 513 U.S. 298, 326–27 (1995). "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray*, 477 U.S. at 496. In *Schlup*, the Supreme Court held that a credible showing of actual innocence was sufficient to enable a court to reach the merits of an otherwise procedurally-barred habeas petition. *Schlup*, 513 U.S. at 317. The actual innocence claim in *Schlup* is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Id*. at 315 (quoting *Herrera v. Collins,* 506 U. S. 390, 404 (1993)).

The actual innocence exception allows a petitioner to pursue his constitutional claims if it is "more likely than not" that new evidence—not previously presented at trial—would allow no reasonable juror to find him guilty beyond a reasonable doubt. *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). The Sixth Circuit has offered the following explanation of the actual innocence exception:

> The United States Supreme Court has held that if a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S.Ct. 851, 130 L.Ed.2d 808. Thus, the threshold inquiry is whether "new facts raise[ +]

24

> sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S.Ct. 851, 130 L.Ed.2d 808. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808.

*Souter*, 395 F.3d at 589–90 (footnote omitted).

Because Petitioner fails to satisfy these standards, the actual innocence exception does not operate to save his otherwise procedurally defaulted claims.

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

### A.    AEDPA Standard of Review

Petitioner seeks habeas relief under 28 U.S.C. § 2254.  The Antiterrorism and Effective Death Penalty Act ("AEDPA") sets forth standards governing this Court's review of state-court determinations.  The United State Supreme Court has described AEDPA as "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court" and emphasized that courts must not "lightly conclude that a State's criminal justice system has experienced the 'extreme malfunction' for which federal habeas relief is the remedy."  *Burt v. Titlow,* 571 U.S. 12, 20 (2013) (quoting *Harrington v. Richter*, 562 U.S. 86 (2011)); *see also Renico v. Lett*, 559 U.S. 766, 773 (2010) ("AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state court decisions be given the benefit of the doubt." (internal quotation marks, citations, and footnote omitted)).

The factual findings of the state appellate court are presumed to be correct.

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). "Under AEDPA, a writ of habeas corpus should be denied unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or based on an unreasonable determination of the facts in light of the evidence presented to the state courts." *Coley v. Bagley*, 706 F.3d 741, 748 (6th Cir. 2013) (citing *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006)); 28 U.S.C. § 2254(d)(1) (a petitioner must show that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law"); 28 U.S.C. § 2254(d)(2) (a petitioner must show that the state court relied on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The United States Court of Appeals for the Sixth Circuit has explained these standards as follows:

A state court's decision is "contrary to" Supreme Court precedent if (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law[,]" or (2) "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives" at a different result. *Williams v. Taylor*, 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an "unreasonable application" under 28 U.S.C. § 2254(d)(1) if it "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular ... case" or either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id*. at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389.

Coley, 706 F.3d at 748–49. The burden of satisfying the standards set forth in § 2254 rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

"In order for a federal court to find a state court's application of [Supreme Court precedent] unreasonable, . . . [t]he state court's application must have been objectively

unreasonable," not merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520–21,

(2003) (internal quotation marks omitted) (citing *Williams v. Taylor*, 529. U.S. at 409 and

*Lockyer v. Andrade,* 538 U.S. 63, 76 (2003)); *see also Harrington v. Richter*, 562 U.S. at 102

("A state court's determination that a claim lacks merit precludes federal habeas relief so long as

"'fairminded jurists could disagree' on the correctness of the state court's decision.") (quoting

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In considering a claim of "unreasonable

application" under § 2254(d)(1), courts must focus on the reasonableness of the result, not on the

reasonableness of the state court's analysis. *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009)

("[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the

ultimate legal conclusion that the state court reached and not whether the state court considered

and discussed every angle of the evidence.") (quoting *Neal v. Puckett*, 286 F.3d 230, 246 (5th

Cir. 2002) (en banc)); *see also Nicely v. Mills*, 521 F. App'x 398, 403 (6th Cir. 2013)

(considering evidence in the state court record that was "not expressly considered by the state

court in its opinion" to evaluate the reasonableness of state court's decision). Relatedly, in

evaluating the reasonableness of a state court's ultimate legal conclusion under § 2254(d)(1), a

court must review the state court's decision based solely on the record that was before it at the

time it rendered its decision. *Pinholster*, 563 U.S. at 181. Put simply, "review under §

2254(d)(1) focuses on what a state court knew and did." *Id*. at 182.

## A. Application

In claim three, Petitioner asserts that he was denied the effective assistance of counsel

because his attorney failed to request limiting instructions or object to admission of improper

prior bad acts evidence. The state appellate court rejected this claim in relevant part as follows:

> Appellant asserts his trial counsel was ineffective in failing to object to the physical
> abuse evidence, failing to request a limiting instruction for each witness that

testified to the physical abuse, and in failing to request a final jury instruction regarding the physical abuse evidence.

"'A competent trial attorney may well eschew objecting * * * in order to minimize jury attention to the damaging material.'". . . . "The failure to raise nonmeritorious objections is not deficient performance.". . . Furthermore, a defendant must establish that the ultimate outcome of the trial would have been different had the objection been made. . . .

Similarly, "the decision not to request a limiting instruction is sometimes a tactical one." *Schaim* at 61, fn. 9. *See also State v. Rawls*, 10th Dist. No. 03AP-41, 2004-Ohio-836, ¶ 42 (noting that counsel may choose not to "request an instruction on other acts evidence" in order "to avoid drawing additional attention to the other acts testimony"); *State v. Griesmar*, 11th Dist. No. 2009-L-061, 2010-Ohio-824, ¶ 33-34.

The physical abuse evidence was admissible pursuant to the three-part *Williams* test. *Id*. at ¶ 20. The defense also relied on the physical abuse evidence to argue that N.F. had a motive to fabricate the sexual abuse allegations. Accordingly, counsel's choice not to object to the physical abuse evidence, or to request additional limiting instructions on the physical abuse evidence, were tactical decisions which do not support an ineffective assistance of counsel claim.

(*Decision*, ECF No. 5, PAGEID # 235-38.)

Petitioner also asserts that he was denied the effective assistance of counsel because his attorney failed to object to the prosecutor's improper comments regarding prior bad acts evidence and unduly prejudicial language in verdict forms. The state appellate court rejected these claims in relevant part as follows:

Appellant asserts that his counsel was deficient in failing to object during closing argument, "when the State argued that the prior bad acts evidence was proof that 'we' can count on [N.F.]" (Appellant's Brief at 54.) During closing, the prosecutor noted L.A. and C.A.W. had corroborated much of N.F.'s testimony, and that N.F.'s testimony of the physical abuse was further "corroborated when we got Children's Services records. So what that tells us is that we can count on [N.F.] to give us reliable, accurate history." (Tr. Vol. V. at 58-59.)

A prosecutor may comment in closing arguments on what the evidence has shown and what reasonable inferences the prosecutor believes may be drawn from it. *State v. Lott*, 51 Ohio St.3d 160, 166 (1990). A prosecutor does not improperly vouch for a witness's credibility by arguing that, based on the evidence, a witness was "a reliable witness to the simple events she witnessed, that she lacked any motive to

lie, [or] that her testimony was not contradictory." *State v. Green*, 90 Ohio St.3d 352, 373-74 (2000). *See also State v. Clay*, 7th Dist. No. 08 MA 2, 2009-Ohio-1204, ¶ 141 (noting that "[l]imiting objection during closing is a trial tactic to avoid trying to draw attention to statements").

The prosecutor's comment was not improper vouching. The prosecutor fairly commented on the evidence from L.A., C.A.W., and children services caseworkers, who all corroborated N.F.'s testimony regarding the physical abuse. Counsel was not deficient in failing to object to the comment.

Appellant asserts defense counsel was deficient in failing to object to the following statement from the prosecutor during closing argument: "I guess in any rape case, the victim has to be lying. Right? Because if the victim is telling the truth, then the defendant has trouble. Right? So every defense in a rape case is the victim is lying, and then" the defense has to "try to scramble to figure out a reason why." (Tr. Vol. V at 109.)

Counsel was not deficient in failing to object to this statement, as the prosecutor was fairly responding to appellant's testimony that N.F. had lied about the sexual abuse allegations. Moreover, there is no reasonable probability that, had counsel objected, the result of the trial would have been different. *State v. Bradley*, 42 Ohio St.3d 136 (1989).

Appellant argues that counsel was deficient in failing to object to a comment the prosecutor made during appellant's cross-examination. The state asked appellant if he believed that N.F.'s frequent vomiting and urinating himself as a child were stress related. Appellant stated "[s]omething was going on," and the prosecutor noted "I would agree with that." (Tr. Vol. IV at 96, 97.) This comment did not express any belief "regarding the guilt of the accused." *Lott* at 166. Rather, the statement merely agreed with appellant's response. Trial counsel could have reasonably chosen not to object to avoid drawing undue attention to the prosecutor's brief and fleeting comment.

Appellant lastly asserts his counsel was ineffective in failing to object to the verdict forms and in failing to "request neutral language on the verdict forms." (Appellant's Brief at 56.) The verdict forms contained captions to identify which conduct was associated with each count.

"Verdict captioning [is] not an improper practice." *State v. Himes*, 7th Dist. No. 08 MA 146, 2009-Ohio-6406, ¶ 31. Verdict captioning "avoids problems such as double jeopardy issues in cases of a hung jury on some offenses but not others. It is not deficient performance to fail to object to these labels merely because the indictment did not specify the type of sexual conduct." *Id. See also State v. Harwell*, 2d Dist. No. 25852, 2015-Ohio-2966, ¶ 60 (noting that "[l]abeling verdict forms is a rational way to identify which verdict is for which offense").

Appellant argues the captions on the verdict forms "insinuate[d] that [appellant] was guilty." (Appellant's Brief at 56.) Appellant identifies the following captions as "inflammatory[:] * * * 'Fellatio-**Victim** on **Defendant**, [L.A.] Presnt' for Count 49, * * * 'Anal Intercouse – **Defendant on Victim**, Defendant's Bedroom Incident' for Count 27, [and] 'Fellatio – **Defendant on Victim** – 1st Anal Incident' for Count 17." (Emphasis sic.) (Appellant's Brief at 56.)

The verdict captions reasonably identified the parties involved, the conduct at issue, and the location to identify which acts related to which charge. *See Himes* at 30-31; *State v. West*, 8th Dist. No. 95331, 2012-Ohio-3151, ¶ 41. Notably, due to the nature of the sex crimes at issue in the instant case, it was necessary to identify which party was performing, and which party was receiving, the sexual conduct at issue. Appellant also fails to identify the language he believes defense counsel should have proffered to the court.

The verdict captions did not insinuate appellant's guilt. Rather, the captions tracked the evidence presented during trial. If the jury believed the defense's evidence that N.F. had fabricated the allegations, the jury retained its independence to return verdicts of not guilty. *See State v. Amos*, 7th Dist. No. 07 BE 22, 2008-Ohio-7138, ¶ 47. As the language in the verdict captions was not inflammatory, defense counsel was not deficient in failing to object to the verdict forms on that basis.

(*Decision*, ECF No. 5, PAGEID 236-39.)

"In all criminal prosecutions," the Sixth Amendment affords "the accused . . . the right . . . to Assistance of Counsel for his defence." U.S. Const. amend. VI. "Only a right to 'effective assistance of counsel' serves the guarantee." *Couch v. Booker*, 632 F.3d 241, 245 (6th Cir. 2011) (citation omitted). The United States Supreme Court set forth the legal principles governing claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 556 (1984). *Strickland* requires a petitioner claiming the ineffective assistance of counsel to demonstrate that his counsel's performance was deficient and that he suffered prejudice as a result. *Id.* at 687; *Hale v. Davis*, 512 F. App'x 516, 520 (6th Cir.), *cert. denied sub. nom. Hale v. Hoffner*, 134 S. Ct. 680 (2013). A petitioner "show[s] deficient performance by counsel by demonstrating 'that counsel's representation fell below an objective standard of reasonableness.'" *Poole v. MacLaren*, 547 F. App'x 749, 754 (6th Cir. 2013) (quoting *Davis v. Lafler*, 658 F.3d 525, 536

(6th Cir. 2011) (internal quotation marks omitted)); (citing *Strickland*, 466 U.S. at 687), *cert. denied*, 135 S. Ct. 122 (2014).  To make such a showing, a petitioner must overcome the "strong [ ] presum[ption]" that his counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 687.  "To avoid the warping effects of hindsight, [courts must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  *Bigelow v. Haviland*, 576 F.3d 284, 287 (6th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689).

The United States Supreme Court has cautioned federal habeas courts to "guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d)."  *Harrington*, 562 U.S. at 105.  The Court observed that, although "'[s]urmounting *Strickland*'s high bar is never . . . easy,' . . . , [e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is even more difficult."  *Id*. (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)), and citing *Strickland,* 466 U.S. at 689.  The Supreme Court instructed that the standards created under *Strickland* and § 2254(d) are both "'highly deferential,' and when the two apply in tandem, review is 'doubly' so."  *Id*. (citations omitted).  Thus, when a federal habeas court reviews a state court's determination regarding an ineffective assistance of counsel claim, "[t]he question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *Id*.

Applying this standard, Petitioner has failed to establish a basis for relief.  The record does not reflect that the prosecutor made improper statements, and the appellate court found that the verdict forms complied with Ohio law.  Similarly, the appellate court determined that the trial court properly admitted other acts evidence under Ohio law.  This Court is bound by the state

court's determination regarding issues of state law. *See Boddie v. Warden, Chillicothe Corr. Inst.*, No. 2:13-cv-1243, 2015 WL 792361, at *8 (S.D. Ohio Feb. 25, 2015) (citing *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988)). Additionally, the trial court instructed the jury that prior bad acts evidence should be considered only in determining N.F.'s state of mind. The record does not reflect that the appellate court unreasonably concluded that defense counsel exercised a reasonable trial strategy by not requesting additional jury instructions or by arguing that N.F. had a motive to fabricate sexual abuse allegations in view of the Petitioner's prior abuse.

> Federal courts have consistently determined that a decision by counsel not to request a limiting instruction can be a sound tactical decision not to emphasize the prior conviction before the jury. *See e.g., Ashe v. Jones*, 2000 WL 263342, at *6 (6th Cir. Feb. 29, 2000) (stating that counsel may have decided, as part of a reasonable trial strategy, not to request an instruction limiting the jury's consideration of the prior bad acts evidence based on the belief that such an instruction would bring undue attention to the other acts); *Ferguson v. Knight*, 809 F.2d 1239, 1243 (6th Cir. 1987) (limiting instructions "inevitably invite the jury's attention to matters the defendant normally prefers not to emphasize"); *Stamps v. Rees*, 834 F.2d 1269, 1276 (6th Cir. 1987) (failure to request jury admonition concerning permissible use of evidence of prior convictions did not constitute ineffective assistance "as it is quite evident that . . . counsel simply wanted to get past the prior convictions as quickly as possible without bringing undue attention to them"); *Robins v. Fortner*, 698 F.3d 317, 337-338 (6th Cir. 2012) (finding no ineffectiveness because counsel "may have . . . made a tactical choice not to provide curative jury instructions to avoid drawing further attention to the fact that the pictures were mug shots"). Thus, many federal habeas courts have rejected claims of ineffective assistance of trial counsel based on counsel's failure to request limiting instructions relating to evidence of prior bad acts. *See Martin v. Wilson*, 419 F.Supp.2d 976, n. 7 (N.D. Ohio 2006) (finding counsel was not ineffective for failing to request a limiting instruction regarding prior conviction because "it was reasonable trial strategy to avoid calling any further attention to this prior conviction which was only briefly mentioned at trial"); *Smith v. Howerton*, 2015 WL 5749440, at *23-24 (E.D. Tenn. Sept. 30, 2015); *Towle v. Warren*, 2014 WL 2879752, at *14 (E.D. Mich. June 24, 2014); *Martin v. Rivard*, 2013 WL 5902624, at *9 (E.D. Mich. Oct. 31, 2013); *Barnes v. Bradshaw*, 2012 WL 2905816, at *28 (N.D. Ohio June 7, 2012). Indeed, the Sixth Circuit has noted "the vast majority of courts hearing ineffective assistance claims based on failure to request a limiting instruction have determined that no prejudice resulted from counsel's failures." *Mackey v. Russell*, 148 F. App'x 355, *9 (6th Cir. 2005).

*Croce v. Miller*, No. 1:15-cv-1758, 2017 WL 3394046, at *19 (N.D. Ohio July 12, 2017)

(footnote omitted).   Because Petitioner has failed to establish that he was denied the effective

assistance of counsel under the two-prong *Strickland* test, claim three lack merit.

## V.      DISPOSITION

For the reasons set forth above, it is **RECOMMENDED** that this action be

**DISMISSED**.

Petitioner's Motion for Stay and Abeyance (ECF No. 7) is **DENIED**.

### PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen

days of the date of this Report, file and serve on all parties written objections to those specific

proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those

portions of the report or specified proposed findings or recommendations to which objection is

made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or

in part, the findings or recommendations made herein, may receive further evidence or may

recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(B)(1).

The parties are specifically advised that failure to object to the *Report and

Recommendation* will result in a waiver of the right to have the district judge review the *Report

and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of

the District Court adopting the *Report and Recommendation.  See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE